1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF VIRGINIA
2                      CHARLOTTESVILLE DIVISION

3    UNITED STATES OF AMERICA,
                                        No. 4:18-cr-12
4                      Plaintiff,
                                        Charlottesville, Virginia
5        vs.                           June 25, 2018
                                        10:29 a.m.
6    JALEN CORMARRIUS TERRY,

7                      Defendant.

8                      TRANSCRIPT OF BOND HEARING
                     BEFORE THE HONORABLE JOEL C. HOPPE
9                      UNITED STATES MAGISTRATE JUDGE.

10   APPEARANCES:

11   For the Government:

12   HEATHER L. CARLTON
     United States Attorneys Office
13   Room 130
     255 West Main Street
14   Charlottesville, VA 22901
     434-293-4283

15

16   For the Defendant:

17   PAUL GRAHAM BEERS
     Glenn Feldmann Darby & Goodlatte
18   37 Campbell Avenue, S.W.
     Roanoke, VA 24011
19   540-224-8035

20

21   Transcribed by:   Carol Jacobs White
                        Registered Diplomate Reporter
22                      PO Box 182
                        Goode, VA 24556
23                      Carol.jacobs.white@gmail.com

24       Proceedings recorded by FTR; computer-assisted transcription.

25

```
 1        (Call to Order of the Court at 10:29 a.m.)

 2            THE COURT:  Will the clerk please call the case.

 3            THE CLERK:  Yes, Your Honor.  This is Criminal Action No.

 4    4:18-cr-12, United States of America versus Jalen Terry, defendant

 5    number eight.

 6            THE COURT:  Is the government ready to proceed?

 7            MS. CARLTON:  Yes, Your Honor.

 8            THE COURT:  Is the defendant ready to proceed?

 9            MR. BEERS:  Yes, Your Honor.  I did not see their brief

10    until I was on I-81 this morning, but --

11            THE COURT:  You didn't read it while you were driving?

12            MR. BEERS:  No.  Absolutely not.  But -- so I haven't

13    researched those authorities.  They are not Fourth Circuit

14    authorities.  My position remains the same.

15            Thank you, Your Honor.

16            THE COURT:  There were a couple of issues raised in the

17    brief, of course, concerning just that information the Court has to

18    consider in making a probable cause determination and issues about

19    presentation of evidence and then also about what witness

20    statements need to be provided.  Do you want to say anything about

21    any of those specific issues (inaudible)?

22            MR. BEERS:  Judge, it is our position, based on -- I

23    think the plain text in the statute is there is a presumption in

24    this case, but it has to be triggered by a probable cause showing

25    and evidentiary showing by -- to convince the judicial officer.
```

The grand jury is not a judicial officer. His Honor is a judicial

officer. And they have to, under 3142, make a showing -- an

evidentiary showing today of probable cause in order to trigger the

presumption. That was our position last week and it is still our

position. That has always been my understanding.

Thank you, Your Honor.

THE COURT: Well, I think the case law supports it. And

I think -- I think I can make a finding of probable cause based on

the fact that the grand jury found probable cause, not that that in

itself is evidence that I can consider in making that

determination. Now, that doesn't cut off your ability to present

evidence to rebut the presumption and for me to hear evidence on

the detention issue and the factors that are outlined in the

(inaudible), but (inaudible) probable cause finding based on

(inaudible).

Ms. Carlton, is there anything else that you would like

to say about (inaudible)?

MS. CARLTON: No, Your Honor. I'll just submit it on the

brief.

THE COURT: All right. Let me -- I have read it and

(inaudible). And I think it makes sense to just address some of

the issues at the outset, because I think it sets the stage for

what we're here to do today.

Now, I do think, Mr. Beers, that you are entitled to call

the case agent to testify and I think you can cross-examine the

1    case agent.  I think that both sides can also proceed by proffer as
2    well.

3          Mr. Beers, the really strict reading of the Bail Reform
4    Act -- I think the part that you cited last week -- it does say
5    that the person -- the defendant can proceed by proffer, but it
6    also says that a person has a right to present witnesses and cross-
7    examine witnesses.  If I read it as strictly as you are proposing,
8    it seems like that would exclude the government's ability to
9    present (inaudible).

10         MR. BEERS:  Yes, Your Honor.  It says "the person."
11   Congress could have said "or the prosecutor."  It said "the
12   person."  And they are clearly talking about the accused.

13         THE COURT:  It certainly could have been more clear.  But
14   I don't read that as -- that sentence as excluding the government
15   from being able to present witnesses and cross-examine witnesses or
16   proffer.  I think that the government can proceed in the same way
17   as the defendant on those issues.

18         Like I said, I certainly think that you have the right to
19   be able to call witnesses, including the case agent, to present
20   information that is relevant to the factors that I have to consider
21   under (inaudible), which (inaudible) factors that are relevant to
22   the detention determination.

23         Now, this detention hearing is not a mini trial or a
24   discovery hearing, so there are going to be some limits on that.
25   If there are -- you know, if there's some testimony that would come

from -- or be attributable to a witness who has not been identified yet, who is confidential, then we're not going to get the identities of witnesses today.

There's also the issue about Rule 26 and the statements that the witness -- any witness may have made and whether you would be entitled to the statements beforehand. And I think that there are -- if this is going to be your witness and you are calling them, I think there are some parts of the rule that would suggest that you are not entitled to get those statements and (inaudible).

MR. BEERS: Your Honor, I agree -- if I call the witness, I agree, on a plain reading of 26.2 and the Jencks Act, I'm not entitled to Jencks material.

I would just like to preserve our objection with respect to our position that they need to call the agent. So what they are doing, by forcing me to call the agent -- or allowing me to call the agent, is depriving him of his 26.2 rights.

Thank you, Your Honor.

THE COURT: All right. Well, then, why don't -- Ms. Carlton, do you have any evidence that you would like to present?

MS. CARLTON: Just the grand jury indictment, so the presumption arises.

THE COURT: Did you want to present any evidence by proffer? I think (inaudible) you indicated that there would be a proffer at least of the circumstances of Mr. Terry's arrest and

1  perhaps some other (inaudible).

2          MR. BEERS:  Motion to exclude.  Because I'm going to call

3  the case agent, I would like to exclude the case agent.

4          THE COURT:  The case agent can be here.  They can have

5  (inaudible) --

6          MR. BEERS:  Thank you, Your Honor.

7          MS. CARLTON:  I'm sorry.  The case agent would be the

8  representative of the United States.

9          MR. BEERS:  All right.

10          MS. CARLTON:  I'm happy to provide that proffer of

11  additional evidence now, Your Honor, or I didn't know whether you

12  wanted to proceed, as outlined in the case law, that the burden of

13  production now shifts to the defendant -- not the burden of

14  persuasion, but the burden of production -- and whether you wanted

15  to shift it back.  I'm flexible to whatever the Court wants to

16  proceed.

17          THE COURT:  I would like for the government to proceed.

18          MS. CARLTON:  Sure.

19          Yes, Your Honor.

20          In addition to a grand jury indictment returning serious

21  charges against this defendant, including multiple counts of

22  924(c), a grand jury has now found probable cause that Mr. Terry is

23  a member of a violent gang.  In addition, we have his criminal

24  history here, which I know Your Honor has seen in the pretrial

25  services report.  I'm happy to pass up a copy.  And, for the

1  record, am passing a copy to defense counsel of the NCIC for his

2  client.

3         THE COURT:  If there's anything different, you can pass

4  that up.  But, otherwise, I'll rely on the pretrial services

5  report.

6         MS. CARLTON:  Your Honor, I think the only thing that is

7  not necessarily different, but additional detail, is Mr. Terry has

8  been convicted of a prior drug distribution charge.  While on

9  probation for that case, he violated that probation and was found

10  guilty of a probation violation in the state court.  He then

11  continued on probation for the next couple of years, through 2017.

12  And I think that might be clearer in the NCIC than it is in the

13  pretrial services report you have.

14         The grand jury has found probable cause that Mr. Terry

15  engaged in attempted murder as well as assault with a deadly weapon

16  during the terms of that probation, after having been convicted of

17  a probation violation.  I think, again, that's clearer in the NCIC

18  than it is in the pretrial services report.

19         And we want to point that out because that would indicate

20  that he would not be a successful candidate for release -- pretrial

21  release in this case.

22         THE COURT:  If you have some information about when his

23  term of probation ended?

24         MS. CARLTON:  I do.  The NCIC indicates that the

25  probation ran through 4/11/2017.

1        Which, Mr. Beers, is on page two of three of the NCIC, at

2    the bottom.

3        MR. BEERS:  Okay.

4        MS. CARLTON:  We would also tell Your Honor -- and I have

5    disclosed this to Mr. Beers -- on June 14th, when FBI agents went

6    to execute the arrest warrant for Mr. Terry in this case, they also

7    executed a federal search warrant.  They searched his residence

8    where he lived just with his mother.  In the residence, in his

9    bedroom, they found approximately two pounds of what appears to be

10   marijuana.  In addition, they found a little over almost $3600.

11   And that was found in three locations:  in Mr. Terry's wallet, in a

12   dresser drawer in his bedroom, and in his closet.

13       FBI agents also found a loaded pistol in the house with

14   an obliterated serial number.  The pistol had one round in the

15   chamber and was ready to be fired.  It was located in the bedroom

16   of what appears to be a little girl, in a bedroom that was near the

17   front door -- close to the entrance, the front door of the

18   residence.  That girl, that child, was not present.  But that

19   weapon would have been accessible to Mr. Terry.  And, in fact, the

20   government would submit, based on his prior activities, that it was

21   Mr. Terry's weapon.

22       I think with all of that factored in, we would say that

23   Mr. Terry -- in addition to the information in his pretrial report

24   that he has never had employment, that he tested positive for

25   cocaine and has admitted to cocaine and marijuana usage, that he

1    would not be a successful candidate for pretrial release.

2            We would also note one last thing.  I know there's an

3    indication at prior hearings that some of these defendants are born

4    and raised in Danville and aren't flight risks, but we would note

5    that we still have two defendants who have, in fact, fled; that one

6    managed to flee for about nine days in this case; and that

7    Mr. Terry has little connection -- you know, little -- he has no

8    employment, no children, no job.  He is not in school.  He actually

9    would be a candidate who could flee in this case.  And so we are

10   not going to -- we are also going to submit that not only is he a

11   danger to the community, but he is a flight risk.

12           THE COURT:  Mr. Beers, do you have any witnesses that you

13   would want to call or evidence?

14           MR. BEERS:  Yes, Your Honor.  Yes, Your Honor.  I call

15   the defendant's mother, Mrs. Terry.

16           THE COURT:  There's a little chair there.  Before you

17   take a seat, though, would you please raise your right hand.

18               ANGELA TERRY, DEFENSE WITNESS, SWORN

19           THE COURT:  You may be seated.

20                      DIRECT EXAMINATION

21   BY MR. BEERS:

22   Q.   Tell Judge Hoppe your full name, please.

23   A.   Angela Terry.

24   Q.   Angela Terry?  All right.

25        And what is your relationship to the defendant?

1   A.   My son.

2   Q.   He's your son?  Okay.

3        And where do you live?

4   A.   1416 Norwood Drive.

5   Q.   Okay.  Can you say it a little louder?  Speak up.

6   A.   1416 Norwood Drive.

7   Q.   All right.  And what do you do --

8            THE COURT:  Danville?

9   BY MR. BEERS:

10  Q.   So you live in Danville?

11  A.   (Inaudible.)

12  Q.   Do you work in the Danville area?

13  A.   Yeah.

14  Q.   Where do you work?

15  A.   I'm a manager at Pizza Hut.

16  Q.   You are a manager at Pizza Hut?

17       If you wouldn't mind speaking up a little bit, because we're

18  trying to make a record.  Okay.

19       So how long have you worked at Pizza Hut?

20  A.   Three years (inaudible).

21  Q.   Okay.  And did you grow up in Danville?

22  A.   Uh-huh.

23  Q.   Is that yes?

24  A.   Yes, I did.

25  Q.   And you went to high school in Danville?

1    A.    Yes.

2    Q.    Okay.  Now, what about your son?  Did he grow up in Danville?

3    A.    Yes.

4    Q.    And did he graduate from a Danville high school?

5    A.    Yes.

6    Q.    All right.  Now, you know that the subject of this -- today is

7    not his trial.  You understand that; right?  Today is the bond

8    hearing, basically.  Right?

9    A.    Uh-huh.

10   Q.    Okay.  Are you here to tell the judge that if he'll let your

11   son go home on a -- any term -- any set of conditions, including a

12   curfew, that your son could live with you?

13   A.    Yes, I am.

14   Q.    Okay.  And do you think you could manage that curfew?

15   A.    Yes, sir.

16   Q.    Who would be in the household with you and your son?

17   A.    He and I.

18   Q.    Okay.  That's it; right?

19   A.    Yes, sir.

20   Q.    All right.  And you have some other relatives here -- or

21   friends with you here in the courtroom, don't you?

22   A.    Uh-huh.

23   Q.    One of those people is his father?

24   A.    Yes, sir.

25   Q.    All right.  So you are not married to his father.  His father

1  and his father's wife are here; is that right?

2  A.    Yes, sir.

3  Q.    Okay.  If he got released, would he have prospects of

4  employment?

5  A.    Yes, sir.

6  Q.    Okay.  And tell the judge where he would work?

7  A.    (Inaudible.)

8  Q.    Okay.  And is that a landscaping company in Danville?

9  A.    Yes.

10  Q.    Okay.  Now, you heard the prosecutor talk about a search

11  warrant and marijuana, two pounds of marijuana, and a firearm that

12  were found in his bedroom, Mr. Terry's bedroom?

13  A.    Yes.

14  Q.    Did you hear her just say that?

15  A.    Yes.

16  Q.    Okay.  Is that the residence you are in now?

17  A.    No.

18  Q.    It is a different residence.  All right.

19        Was he living with you, though, at that time?

20  A.    Yes.

21  Q.    Okay.  Did you know there was marijuana --

22  A.    Uh-uh.

23  Q.    Did you know he had a firearm in his bedroom?

24  A.    (Inaudible.)

25  Q.    Okay.

1          All right.  Anything else you want to --

2    A.    The bedroom that they had the firearm in wasn't his room.

3    Q.    Sorry.  Can you say that a little louder?

4    A.    The bedroom that they got the firearm out of wasn't his room.

5    Q.    Okay.  Did the firearm belong to you?

6    A.    (Inaudible).

7    Q.    Okay.  Well, whose bedroom was it?

8    A.    I just let people (inaudible) spend the night, sleep in that

9    room.  Nobody used that room (inaudible).

10   Q.    All right.

11             MR. BEERS:  No further questions, Your Honor.

12             THE COURT:  Ms. Carlton, do you have any questions?

13             MS. CARLTON:  Just briefly.

14                        CROSS-EXAMINATION

15   BY MS. CARLTON:

16   Q.    Mrs. Terry, good morning.

17   A.    Good morning.

18   Q.    On June 14th, when the FBI searched 687 Berryman Avenue, were

19   you living there with your son?

20   A.    Yes.

21   Q.    And he was a resident of that address; correct?

22   A.    Yes.

23   Q.    And it was just the two of you living there?

24   A.    Yes.

25   Q.    Okay.  And that bedroom in the front belongs to a young girl;

1   is that right?

2   A.   No.  It don't belong to nobody.

3   Q.   It doesn't belong to anybody?

4   A.   (Inaudible).

5   Q.   You have to answer aloud for the record.

6   A.   It don't belong to anybody.

7   Q.   Okay.  And that loaded pistol was found in that bedroom;

8   correct?

9   A.   Yeah.

10  Q.   And that's not your bedroom?

11  A.   No.

12  Q.   Okay.  And that's not your weapon?

13  A.   No.

14  Q.   And you don't know how that gun got there, do you?

15  A.   No.

16  Q.   And when you were living with Mr. Terry, at the time two

17  pounds of potentially marijuana was found in his closet; correct?

18  A.   (Inaudible).

19  Q.   And this address of 1416 Norwood Drive that you have just

20  mentioned, you just moved there, then, in the last 10 days or so?

21  A.   Yeah.

22  Q.   Who else lives there?

23  A.   Only one is me.

24  Q.   Just you?

25  A.   Yeah.

1    Q.    Could you answer for the record?

2    A.    Yeah.

3    Q.    Okay.  Thank you.

4          Do you intend for anyone else to be living there along with

5    -- other than you and Mr. Terry?

6    A.    No.

7    Q.    And probation is correct that Mr. Terry has never held a job;

8    right?

9    A.    Yeah.

10   Q.    And so your father -- you said that was his landscaping

11   company that Mr. Terry would work at?

12   A.    Yes.

13   Q.    Okay.  What is the name of that landscaping -- let me move

14   over here so you don't have to turn your head so far.

15   A.    Terry's lawn -- landscaping (inaudible) landscaping.

16   Q.    And Mr. Terry could have worked there in the past; correct?

17   A.    Yeah, but he (inaudible).

18   Q.    How long has that landscaping company existed, to your

19   knowledge?

20   A.    (Inaudible).

21   Q.    And Mr. Terry has never worked there?

22   A.    He has helped (inaudible).

23   Q.    Okay.  And Mr. Terry has not been in school; correct?

24   A.    No, he has (inaudible).

25   Q.    But he wasn't in school when he was arrested in this case, was

1  he, ma'am?

2  A.    No.

3  Q.    Okay.  Thank you.

4           MS. CARLTON:  No more questions.

5           THE COURT:  Mr. Beers, any questions?

6           MR. BEERS:  No, Your Honor.

7           THE COURT:  All right.  Thank you, Mrs. Terry.

8           MR. BEERS:  Defense calls the case agent.

9           THE COURT:  Please raise your right hand.

10             JAMES DWYER, DEFENSE WITNESS, SWORN

11                     DIRECT EXAMINATION

12  BY MR. BEERS:

13  Q.    All right, sir.  We have just been calling you "the case

14  agent" all morning.  So could you tell us your name?

15  A.    It is James Dwyer.

16  Q.    James Dwyer?

17  A.    Yes, sir.

18  Q.    And are you out of the Charlottesville FBI field office?

19  A.    I am.

20  Q.    Okay.

21      Can you tell me -- were you at the search we heard about this

22  morning?

23  A.    I was not.

24  Q.    You were not there.  So you have no evidence to share as to

25  what was found?

1  A.   I have the -- I have seen the report, but I cannot

2  (inaudible).

3  Q.   I haven't seen that.  But, I mean, you are not a witness to

4  anything that was found there or not found there?

5  A.   I was not a witness to it.

6  Q.   Okay.  So you didn't do an affidavit for that search warrant?

7  A.   I didn't.

8  Q.   Okay.  Well, were these federal officers or state officers

9  that went into the home?

10  A.   They were both.

11       It was led by a federal team.  And there's one or two state

12  officers on the team (inaudible) federal officer.

13  Q.   Okay.  All right.

14       And do you have any -- do you have any information that

15  Mr. Terry was involved with any kind of gang activity in Danville,

16  Virginia?

17  A.   Yes, sir.

18  Q.   All right.  Are these things that you know?

19  A.   Yes, sir.

20  Q.   And how do you know these things?

21  A.   Through (inaudible), through (inaudible), and through

22  self-admissions created on social media.

23  Q.   Okay.  Did he make any statements to that effect, Mr. Terry?

24  Has he made any statements against his penal interest to that

25  effect?

1  A.  Post-arrest, sir?

2  Q.  Post-arrest.

3  A.  Not that I'm aware of, sir.

4  Q.  And he was *Mirandized* post-arrest?

5  A.  Yes, sir.

6  Q.  And he made no statements?

7  A.  Not that I'm aware of, sir.

8  Q.  All right.  Now, you said something about social media?

9  A.  Yes, sir.

10  Q.  You think he has made an admission on social media that he was

11  in a gang?

12  A.  Yes, sir.  Multiple -- multiple witnesses have indicated that

13  and he has indicated that as well.

14  Q.  I mean, have you seen something on a Facebook page saying,

15  "I'm in a gang?"

16  A.  I have seen -- I have seen indication, yes, that he is

17  identifying with a Blood sect, a MILLA sect, on Facebook, sir.

18  Q.  So you have seen a post by him that you think says that he's

19  in -- did he say that?  What did he -- what did he say?

20  A.  He said -- I believe his words were, "Gonna be set

21  (inaudible), ain't no (inaudible).

22  Q.  Okay.  And is that --

23  A.  Yes, sir.

24  Q.  Okay.  All right.

25      All right.  Armonti Devine Womack, who is that?

1  A.   He's a --

2          MS. CARLTON:  Objection.  Where are we going?

3          MR. BEERS:  Count Two.  The headline says, "Violent crime

4  in aid of racketeering," and it mentions Armonti Devine Womack.  I

5  don't know.  I want to know if he has any information which would

6  show probable cause on that.

7          THE COURT:  Well, why don't we have (inaudible).

8          MR. BEERS:  Okay.  All right.

9  BY MR. BEERS:

10  Q.   Do you have any idea who that is, Mr. Womack?

11  A.   I do.

12  Q.   Okay.  Do you have any information to suggest that Mr. Terry

13  attempted to murder Mr. Womack?

14  A.   Yes, sir.

15  Q.   Is that an admission on his part?

16  A.   No, sir.

17  Q.   Okay.  Where does it come from?

18  A.   It comes from a witness.

19  Q.   Who is the witness?

20  A.   He's --

21          MS. CARLTON:  Objection.

22  BY MR. BEERS:

23  Q.   Who is the witness?

24          MS. CARLTON:  Now we're diving into discovery.

25          THE COURT:  I don't think we need to get into identifying

1    the witness.  But you can ask questions and find out what Mr. Terry

2    (inaudible), all of that (inaudible).

3    BY MR. BEERS:

4    Q.   What was his alleged --

5         MR. BEERS:  Thank you, Your Honor.

6    BY MR. BEERS:

7    Q.   What was his alleged involvement?

8    A.   His alleged involvement was one of the shooters (inaudible).

9    Q.   Was -- did he fire a gun at Mr. Womack?

10   A.   That is information that I have received; yes.

11   Q.   And that is coming from this unnamed witness you are telling

12   us about; right?

13   A.   Yes, sir.

14   Q.   Okay.  And was this a *Mirandized* statement by this --

15        MS. CARLTON:  Objection.

16        MR. BEERS:  I don't know what the quality of the evidence

17   is.  Some witness says he attempted to murder somebody.  I don't

18   know if that's probable cause, if they can't tell us anything about

19   the witness.

20        MS. CARLTON:  Well --

21        THE COURT:  I don't want to be getting into (inaudible).

22   You can find out the circumstances of how the statement was

23   provided (inaudible).

24        MR. BEERS:  Okay.  All right.

25   BY MR. BEERS:

1    Q.    Does the witness have a record?

2              MS. CARLTON:  Objection.

3    BY MR. BEERS:

4    Q.    Is the witness in this gang?

5              MS. CARLTON:  Objection.

6              THE COURT:  Yeah.  Let's --

7              MR. BEERS:  All I can say is some --

8              THE COURT:  We're not delving into trying to identify --

9              MR. BEERS:  So the witness could be John Gotti.  We don't

10   even know who the witness is, Judge.  I mean -- I mean anything

11   about the witness -- all right.

12             All right.  Thank you, Your Honor.

13   BY MR. BEERS:

14   Q.    Do you have any information to share that Mr. Terry, here, was

15   involved in an attempt to murder Dwight Montel Harris?

16   A.    Yes, sir.

17   Q.    Okay.  Again, any admission on his part?

18   A.    Not that I'm aware of, sir.

19   Q.    Is that based on a witness telling you something?

20   A.    Yes.

21   Q.    And what did the witness tell you?

22   A.    Again, sir, that Mr. Terry was one of the shooters.

23   Q.    That -- again, that he pulled the trigger on a weapon?

24   A.    Yes, sir.

25   Q.    All right.  And is that a different witness or the same

1  witness?

2        MS. CARLTON:  Objection.

3        MR. BEERS:  I just want to know if it is the same guy.

4        THE COURT:  I'll allow it.

5  BY MR. BEERS:

6  A.   It is the same witness.

7  Q.   The same witness?  Okay.

8        Did the witness tell you that -- withdrawn.  Okay.

9        And Mr. Terry has, in your information, absolutely nothing to

10  do with the murder of Christopher Lamont Motley; right?

11  A.   Not that I'm aware of, sir.

12  Q.   Mr. Terry is charged with three 924(c) counts.  And you are

13  aware of what 924(c) is, basically.  All right.

14       All right.  Can you just tell me what is the probable cause

15  for each of those, in your mind?

16  A.   The --

17        MS. CARLTON:  I'm sorry.  Other than the witness

18  statements to law enforcement?

19        MR. BEERS:  Okay.

20        MS. CARLTON:  So I guess my objection is -- I don't

21  understand the question, so objection for ambiguity.

22        MR. BEERS:  Well, he's charged with three 924(c) counts.

23  I just want him to summarize, in his mind, what is the probable

24  cause to justify those three, to believe that he is guilty of three

25  924(c)s.

 1          MS. CARLTON:  And I -- then I would just object that it

 2   is for the legal conclusion, right -- he's asking the agent to form

 3   the legal basis.

 4          THE COURT:  (Inaudible) ask what are the facts that you

 5   understand that would support these charges?

 6          THE WITNESS:  My understanding is that in each case that

 7   Mr. Terry was the shooter.  He pulled the trigger.

 8   BY MR. BEERS:

 9   Q.   In each of those three cases, each of the three charged cases?

10   A.   I think -- yes, on Womack, on Harris, and -- I'm sorry.  Can

11   you recollect the third for me?

12   Q.   I don't know.  If you don't remember, that's fine.

13   A.   Okay.

14   Q.   So there's three?

15          THE COURT:  Well, if there are three 924(c) charges,

16   (inaudible).  The charges there is a count -- Count Five --

17          MS. CARLTON:  Count Three would be the first one.

18          MR. BEERS:  Count Three is the first one, yes.

19          THE COURT:  Count Three, use of a firearm in attempted

20   murder of Mr. Womack; Count Five is use of a firearm and assault

21   with a dangerous weapon of Mr. Womack; Count Seven, use of a

22   firearm during an attempted murder of Mr. Harris.

23          There's also Count Nine --

24          MS. CARLTON:  That's right.

25          THE COURT:  -- which (inaudible).  And that's the assault

1  with a dangerous weapon of Harris.

2        I think that's what you're asking about; right,

3  Mr. Beers?

4        MR. BEERS:  Yes, Your Honor.

5  BY MR. BEERS:

6  A.  So, yes.  So the two incidents.  So, yes, my understanding is

7  that Mr. Terry pulled the trigger in both of those (inaudible) the

8  924 (inaudible).

9  Q.  And the evidence that the government has on those charges is

10  based on this witness's report; correct?

11  A.  Yes, sir.

12  Q.  Okay.  But do you have any other evidence besides what the

13  witnesses told you, on those three counts -- those four counts?

14  A.  No, sir.  Not that I'm aware of.

15  Q.  So this -- this is a pretty important witness to your case,

16  isn't it?

17        MS. CARLTON:  Objection.  Now we're just trying to get --

18        MR. BEERS:  Withdrawn.

19  BY MR. BEERS:

20  Q.  Is the witness charged?

21        MS. CARLTON:  Object -- Your Honor, now -- he's just

22  trying to back-door discovery.

23  BY MR. BEERS:

24  Q.  Okay.  So, I mean, all we have -- well, that's -- the whole

25  case, all of those 924(c)s, rest on one witness report?

1  A.   Yes, sir.

2  Q.   Is that right?  There's no forensic evidence?

3  A.   Not that I'm aware of, sir.

4  Q.   I mean -- all right.

5       Do you have any evidence to suggest he's a flight risk if he's

6  let out on bond?  Do you have any evidence that he's a flight risk

7  if he's let out on bond?

8  A.   Evidence -- I would say that (inaudible) said earlier, that

9  there are multiple individuals in this case who have fled, one for

10  almost nine days, (inaudible) have fled.

11  Q.   Okay.

12  A.   And my experience is that that is possible, yes.

13  Q.   Okay.

14       MR. BEERS:  All right.  thank you, Your Honor.

15       MS. CARLTON:  Just very briefly, Your Honor.

16                    CROSS-EXAMINATION

17  BY MS. CARLTON:

18  Q.   Agent Dwyer, in addition to the statements of the witness that

19  you have testified about, isn't there also ballistic evidence for

20  the June 15th, 2016, shooting at North Hills Court?

21       MR. BEERS:  Objection.  Leading.

22       MS. CARLTON:  It is cross-examination.

23       THE COURT:  Well, (inaudible) your witness.  I'll allow

24  some direction about where you are going, but (inaudible).

25       MS. CARLTON:  Okay.  So it is not cross-examination,

1   then?

2           THE COURT:  No.  I think that -- he's the case agent.  I

3   think that the defendant can cross, but he's sitting at the table

4   with you.

5           MS. CARLTON:  No, I --

6           THE COURT:  I'm not going to allow cross-examination of

7   the government's agent by the government's attorney.

8           MS. CARLTON:  Sure.  Sure.  Okay.

9   BY MS. CARLTON:

10  Q.   Is Mr. Terry charged with multiple counts related to a single

11  shooting event --

12  A.   Yes.

13  Q.   -- for June 15th, 2016?

14  A.   Yes.

15  Q.   And is there ballistic evidence in that case?

16  A.   Yes, ma'am.

17  Q.   Does the ballistic evidence corroborate the witness statements

18  that you have previously disclosed?

19  A.   Yes, ma'am.

20  Q.   Okay.  Is the June 15th shooting corroborated by any other

21  potential witness statements, such as people walking into North

22  Hills Court or anything of that nature?

23  A.   Would you repeat that?

24  Q.   Sure.  In addition to the witness statement that you have

25  talked about on direct -- or cross by the defendant and the

1    ballistics, are there any other -- is there any other evidence,

2    such as other witness statements, that would corroborate what you

3    have disclosed?

4    A.   Yes.

5    Q.   Okay.  Thank you.

6              THE COURT:  Mr. Beers.

7              MR. BEERS:  Just briefly.

8                        REDIRECT EXAMINATION

9    BY MR. BEERS:

10   Q.   What is the ballistics evidence, then?

11   A.   There were over 75 shell casings that were found on the scene.

12   Q.   Yeah.

13   A.   There were also rounds that were found inside of apartments,

14   vehicles.  So it has actually been (inaudible).

15   Q.   Okay.  But why is that probable cause that he did it?

16             MS. CARLTON:  Objection.  Calls for a legal conclusion.

17   BY MR. BEERS:

18   Q.   I mean, what -- I thought we were talking about ballistic

19   evidence tying Terry to the crimes?

20             THE COURT:  I think that's a fair question.  What is the

21   evidence -- ballistic evidence or other corroborating evidence that

22   you think you have that ties in Mr. Terry?

23             THE WITNESS:  The -- the witness has indicated that

24   Mr. Terry carries a certain type of weapon that would be consistent

25   with the ballistic findings at the scene.

1  BY MR. BEERS:

2  Q.   The witness told you that they have seen Terry with a gun that

3  is consistent with the types of shell casings found at the scene?

4  A.   Yes, sir.

5  Q.   Okay.  What kind of gun is that?

6  A.   It was a (inaudible), sir.

7  Q.   Okay.  Have you done a --

8  A.   (Inaudible) rifle.

9  Q.   Rifle?

10  A.   Yes, sir.

11  Q.   Okay.  Have you done a FBI form -- interview 302 form for this

12  witness?

13  A.   Yes, sir.

14  Q.   Okay.  At least one?

15  A.   Yes.

16  Q.   Okay.  All right.

17        MR. BEERS:  Thank you, Your Honor.

18        THE COURT:  All right.  (Inaudible).

19        MS. CARLTON:  Can I just clarify one thing so it is not

20  an issue later, Your Honor, just to clarify that the agent himself

21  had not personally completed a 302 for that witness, but other FBI

22  agents have, because I don't want there to be an issue later with

23  -- wondering where Agent Dwyer's 302 is.

24        THE COURT:  All right.

25        MS. CARLTON:  Okay.  Thank you.

1      MR. BEERS:  One more question, then, Judge.

2  BY MR. BEERS:

3  Q.   Have you ever interviewed the witness?

4  A.   I have not.

5          THE COURT:  Mr. Beers, any additional evidence?

6          MR. BEERS:  No, Your Honor.

7          THE COURT:  Well, (inaudible).

8          MR. BEERS:  May it please the Court.

9      Judge, I appreciate you giving us a second hearing on

10  this matter.  I -- you know, obviously, these are serious charges.

11  No one is debating that.  But there's no evidence he is a flight

12  risk.  Just because -- I guess, a couple other people have been

13  charged and there are multiple indictments here, but I guess they

14  are talking about this case, maybe they are talking about one of

15  the companion indictments, but just because other people have fled

16  doesn't mean he would flee.  I think that's, you know, classic

17  guilt by association.

18      He's here.  He hasn't given them any problems.  And he's

19  -- you know, based on his mother's testimony that he grew up in

20  Danville, went to high school in Danville, she lives in Danville,

21  works in Danville, she can go -- he can -- she's willing to have

22  him while on bond, there's just no evidence of a flight risk.  He

23  has got perfectly fine community and family ties to Danville.

24      As far as the probable cause determination, I'm glad we

25  had this hearing.  I mean, I really am.  Because, you know, we have

```
 1   got a very articulate case agent here who has told us, you know, in
 2   six different ways their case appears to rise and fall on the
 3   testimony of a witness that the prosecution doesn't want to
 4   identify, even though we are already post-indictment.
 5           That's their evidence:  one witness.  We don't know
 6   anything about this witness, because they won't tell me who it is.
 7   We don't know about their criminal record.  They are happy to wave
 8   around Mr. Terry's record, but they won't tell us the record of
 9   this witness who says he was involved as one of the shooters.
10   That's their case.  That's the evidence before the Court.  So
11   that's not a particularly strong case.
12           Yes, they are particularly strong -- serious charges.
13   But that evidence -- I mean, they brought in an agent that hasn't
14   even interviewed this witness.  So he's giving us some hearsay
15   -- double -- triple hearsay.  And there's nothing -- no other
16   evidence.  I mean, on leading -- prompted by leading questions,
17   they brought up ballistic evidence.  That didn't go anywhere.  So
18   that's it.
19           So I'm glad we had this hearing.  I don't think it is a
20   good idea to dispense with hearings in cases of this nature.  And I
21   think that this proves it.
22           I would ask the Court to release him on bond, with a
23   strict curfew and any other conditions the Court finds reasonable,
24   including drug testing and including that he has to work during
25   daylight hours.
```

1          Thank you, Your Honor.

2          THE COURT:  Mr. Beers, how do I address the other

3     concerns that are identified in the pretrial services report?

4     Mr. Terry has a prior felony drug conviction, probation violation.

5     The allegations in the complaint -- focused on Counts Two through

6     Nine, but there's a lot of -- I think the indictment spends a lot

7     of time in Count One describing a gang that he was involved in, in

8     a leadership capacity.  And there's allegations that while he was

9     on probation there was a search conducted of the house that he and

10    his mother (inaudible) two pounds of marijuana and a firearm found

11    there. I mean, those are serious concerns.  And how do we address

12    those (inaudible)?

13         MR. BEERS:  That there be no firearms allowed in the

14    house -- I mean, they tried to say the firearm was within the

15    bedroom.  They didn't bring an agent to say that.  They brought an

16    agent that wasn't even involved in the search.  And his mother's

17    testimony is unrebutted that it wasn't in his bedroom.  But, in any

18    event, certainly the Court could -- would order as a standard

19    condition there be no firearms in the house.

20         THE COURT:  She said it wasn't her gun.  And they were

21    the only two people living in the house.

22         MR. BEERS:  Right.  So there was a firearm in the house.

23    There are firearms in lots of houses, Judge.  But if he's on bond,

24    I think she will raise her right hand and look you in the eye --

25         THE COURT:  Those firearms are usually generally

1    possessed by the people living in the house.

2              MR. BEERS:  Right.  I don't know, Judge.  But there's no

3    evidence --

4              THE COURT:  It is a tough piece of evidence.

5              MR. BEERS:  All right.  Thank you, Your Honor.

6              THE COURT:  Ms. Carlton.

7              MS. CARLTON:  Your Honor, we have provided -- I'll submit

8    on what we have provided.  Thanks.

9         (Pause.)

10              THE COURT:  Well, Mr. Terry, what I have to consider and

11    determine is whether there are conditions under which I can release

12    you that would reasonably satisfy me that you would not be a danger

13    to the community or a flight risk.  And there are a number of

14    factors that I have to consider under the Bail Reform Act about

15    past history and the nature of the charge against you and the

16    weight of the evidence against you.

17              And I think the evidence that is particularly meaningful

18    or probative in this case is you are 24 years old.  You have one

19    prior felony conviction for drug distribution and a probation

20    violation.  Those things certainly don't weigh in your favor.  You

21    are charged in nine counts of this indictment.  Count One is the

22    conspiracy that alleges that you were involved at a high level in a

23    violent gang and that those gang activities took place (inaudible)

24    during much of the time that you were on probation.  And that tells

25    me that if there are conditions that I have placed on you -- just

like there are conditions of probation, that if you were violating

the law while you were on probation, it tells me that you are not

likely to follow the rules that I put on you.

Now, you are presumed innocent at this time.  There is

just allegations against you.  Today is, obviously, not a trial.

There's going to be a lot more evidence that the government and

that your attorney develop over the course of this trial.  But, you

know, based on what I have at this point, those things don't go in

your favor.

Now, the fact that you -- and the evidence is you never

-- never had a job, maybe you had done a little bit with your

grandfather with the landscaping, but $3600 in cash was found in

the search, two pounds of marijuana that was in the closet in your

bedroom, and then a loaded gun in the house where you -- just you

and your mother resided, those things -- I just don't see what

conditions I could put on you that would assure the safety of the

community when there's this sort of evidence that suggests

(inaudible).  And it is serious criminal conduct.

I don't -- I don't find that there's evidence to show

that you are -- clear and convincing evidence that you are a flight

risk.  I think -- I think it is somewhat close, not because you

don't have ties to Danville, but because of the nature of the

charges against you that are so serious.  But I don't (inaudible)

flight risk on the danger (inaudible).  I don't think there are

conditions that I can (inaudible) that would allay (inaudible).

1      Is there anything else we need to take up in the case at

2 this point?

3           MS. CARLTON:  No, Your Honor.  Thank you.

4           THE COURT:  Mr. Terry -- and I will enter a written

5 detention order.

6           MR. BEERS:  Thank you, Your Honor.

7           THE COURT:  All right.  Thank you.

8           And I would ask the marshal to declare the court in

9 recess.

10      (Thereupon, these proceedings were adjourned at 11:10 a.m.)

11

12                      EXAMINATION INDEX

13

ANGELA TERRY, DEFENSE WITNESS
14      DIRECT BY MR. BEERS                              9
        CROSS BY MS. CARLTON                            13
15
JAMES DWYER, DEFENSE WITNESS
16      DIRECT BY MR. BEERS                             16
        CROSS BY MS. CARLTON                            25
17      REDIRECT BY MR. BEERS                           27

18

19

20      I, court-approved transcriber, certify that the foregoing is a

21 correct transcript from the official electronic sound recording of

22 the proceedings in the above-entitled matter.

23

24      _____/s/ Carol Jacobs White_____  ____August 14, 2018_____
        Signature of Approved Transcriber          Date

25